WILLIAM McBEE *vs.* C. C. FULTON and A. K. FULTON.

## LIBEL.

*Privileged communications—Reports of proceedings before Justices of the Peace—When protected as privileged communications—Such reports must be substantially true, fair and bona fide—Charges and Comments—Subsequent publications of alleged Libel—Evidence—Character of evidence required under Plea of Justification, where crime imputed to plaintiff—Evidence of previous acquittal on criminal charge of the matters charged in the alleged Libel inadmissible—Evidence of character—Confined to those traits of character which the imputed offence involves.*

There are some communications which on grounds of *public policy* are *absolutely privileged ;* and there are others to which, on grounds of public benefit, a *qualified privilege* is given, or those which are privileged by the occasion, if fair, *bona fide* and impartial, though defamatory of individuals and published to the world at large.

Under the second class are included newspaper and other reports of the proceedings of *Courts of Justice.*

And on the same grounds of public benefit and advantage, and within the same limits, the privilege extends to newspaper and other reports of debates and proceedings in parliament or legislative bodies in this country.

At one time the preponderance of judicial *opinion,* at least, in England was against according the protection of privileged communications to publications of reports of proceedings before justices of the peace, in the course of preliminary inquiries upon a charge of an indictable offence, resulting in holding a party to bail, or committing him for the action of the grand jury.

The *dignity* of the Court cannot be regarded in considering whether or not the protection of privilege is to be accorded to reports of judicial proceedings therein ; we must look only to the *nature* of the alleged judicial proceeding

which is reported, and for this purpose no distinction can be made between a Court of *pie poudre* and the House of Lords sitting as a Court of Justice.

By our Constitution justices of the peace are made part of the judiciary in whom the judicial power of the State is vested. The most useful and important part of their duties is to investigate charges for indictable offences, and when so acting they are unquestionably judicial officers discharging judicial functions.

When thus publicly acting in the discharge of judicial duties, there is no reason why these proceedings, thus publicly conducted before magistrates, whether the accused permits them to be *ex parte* or makes his defence, or whether they result in his discharge or committal, should not be deemed the proceedings of a public Court of Justice, and reports of them entitled to this qualified privilege under the law of libel.

The reports, though they need not be *verbatim*, must be substantially correct, and not garbled or partial, and made *bona fide*, and without malice.

Whether they are of this character or not is in all cases, where the plea of justification is set up and under consideration, a question of fact for the jury.

And the same thing is true of the comments accompanying such reports; they must be honest and fair, and it is for the jury to say whether they are so or not.

Subsequent publications of an alleged libel, if admissible in evidence at all, are to be considered only as tending to prove that the original publication proceeded from express malice or ill-will to the plaintiff.

If an alleged libel impute to the plaintiff the commission of a crime, and the plea of justification is interposed, the defendant must fasten upon the plaintiff all the elements of the crime both in act and intent, and to do this he must furnish evidence enough to overcome in the minds of the jury the natural presumption of innocence as well as the opposing testimony.

But to go further and say that this shall be done by such a degree and quantity of proof as shall suffice to remove from the minds of the jury every reasonable doubt that might be suggested is to import into the trial of civil causes between party and party, a rule which is appropriate only in the trial of an issue between the State and a person charged with crime, and exposed to penal consequences if the verdict be against him.

In an action for libel where under the plea of justification the defendant has offered evidence tending to prove the truth of the charges made in the alleged libel, record evidence of the acquittal of the plaintiff on a criminal charge for the same matters as are charged in the alleged libel, is inadmis-

sible in rebuttal of the evidence so offered under the plea of justification; *nor indeed does it seem to be admissible at all.*

Where under the plea of justification proof is offered by the defendant tending to show that the plaintiff was guilty of the imputed offence, and the latter seeks to repel the defendant's proof on that subject and show his innocence by evidence of good character, his evidence on that point and for that purpose must be confined to those traits of character which the imputed offence involves.

APPEAL from the Circuit Court for Howard County.

The appellant sued the appellees, the editors and proprietors of a daily newspaper called "The Baltimore American and Commercial Advertiser," published in Baltimore City, for the following alleged libel upon him, which appeared in that paper on the 25th of September, 1875, under the heading "*A Ruffian Caged.*"

"For several weeks past the police of the North-Western District have been endeavoring to make the arrest of a man named Wm. McBee, who has occasioned considerable trouble in various neighborhoods. It appears he is a low character who habitually frequents the streets and always seeks to throw himself in the way of school girls, often insulting them with indecent remarks and actions. In some instances he would wait around the schools until the dismissal of the pupils, and then would exhibit the greatest importunity in pressing his company upon them. This man and his reputation became so extensively known in many of the female schools that he was feared by the scholars and numerous precautions adopted to protect the girls from his insults.

"For several days past he had been visiting the locality of a well-known and fashionable school, and created the greatest annoyance to the young ladies by his persistent familiarities and vulgar insults. The police were notified and yesterday succeeded in arresting him.

"He was given a hearing in the afternoon, when a number of young ladies who had been approached testified as

to the facts as above narrated. Justice McCaffray committed him for the action of the Grand Jury."

The defendants pleaded,

1st. Not guilty; and 2nd, that the said alleged defamatory writing set out in the declaration is true. Upon these pleas issues were joined and the case proceeded to trial.

The plaintiff offered in evidence the libellous publication declared on, and two substantial repetitions of the same after suit brought. He then further offered evidence tending to show that he was a laboring man—a mechanic—having a large family to support from the fruits of his labor; the wealth and position of the defendants, and the extent of the circulation of the "American" newspaper, in which the libellous publications appeared; and that the defendants were the editors, publishers and proprietors of the said paper; and here the plaintiff rested his case.

*First Exception.*—The defendants, to sustain the issue on their part, offered evidence tending to prove that the plaintiff was arrested and taken before Justice McCaffray, upon a charge of indecent exposure of person, and that an investigation and hearing was had upon said charge before said justice, and witnesses examined thereat, but no witnesses were produced or examined on the part of plaintiff, and upon said examination the said justice committed the plaintiff for the action of the grand jury; and they further offered evidence tending to prove, that said justice, at the termination of said examination, narrated the facts as they had been given in evidence before him on examination, to the reporter of the "American" newspaper, and that the narrative of facts elicited upon said examination, as set out in said supposed libel, so far as the same appears to be a narrative thereof, is a substantially true summary of said facts as detailed to him by said committing magistrate; and the defendants further offered evidence tending to prove, that said narra-

tive was prepared and published in said paper by said reporter, as agent of the defendants, from the information thus furnished to him by said justice, as and for a correct narrative thereof.

And the defendants further offered evidence tending to prove, that they had no acquaintance with or any knowledge of the existence of the plaintiff prior to said publication. To this offer the plaintiff, by his counsel, objected, but the Court overruled the objection, and permitted the witness to testify under the offer made; to which ruling and decision the plaintiff excepted.

*Second Exception.*—The defendants, further to sustain the issue on their part, offered evidence by several witnesses tending to show that they saw a man making indecent exposures of his person to them on the morning of September 24th, 1875, at about the hour of half-past eight o'clock, and on two other occasions, and whom the said witnesses identified as the plaintiff.

To this testimony of the defendants the plaintiff offered evidence in rebuttal, and for that purpose offered in evidence the record of the trial and acquittal of the plaintiff on the charge of indecent exposure of his person, on the occasions referred to, by the Criminal Court of Baltimore City.

But the defendants objected to the admissibility of the evidence so offered; and the Court having sustained the objection, the plaintiff excepted.

*Third Exception.*—And the plaintiff, further to sustain the issue on his part, offered the testimony of several witnesses, tending to prove that at the time of the committal of the alleged offence the plaintiff was absent some two or three miles from the locality where it was said the indecent exposure of his person was made.

And the plaintiff, further to sustain the issue on his part, offered the testimony of a number of witnesses, tending to prove that they had known the plaintiff for many

years, and that he was a man of good moral character. To this offer to prove the plaintiff's good moral character the defendants objected, and the Court sustained the objection, but ruled that the plaintiff could show what his character was for "delicacy, modesty and chastity:" and it was shown to be good for delicacy, modesty and chastity. To this ruling of the Court sustaining defendant's objection, and to the ruling restricting plaintiff's offer, as above stated, the plaintiff excepted.

After the evidence was concluded, several prayers were offered on each side, by which questions were presented for the decision of the Court, (1) as to the privileged character of publications of preliminary proceedings before justices of the peace: (2) as to the fairness of comments accompanying the narration of the matters of fact charged in the alleged libel: (3) as to the character of the proof necessary under a plea of justification where crime is imputed to the plaintiff: (4) as to the extent of the damages to be awarded, if the jury should find for the plaintiff: and (5) as to the legal presumption of malice in cases of libel and the necessity of proving express malice. To the rulings of the Court below upon the questions thus presented, the plaintiff excepted and took this appeal. The questions raised by the exceptions are fully discussed in the opinion of the Court.

The cause was argued before BARTOL, C. J., BOWIE, MILLER, ALVEY and ROBINSON, J.

*Alex. H. Hobbs* and *J. Thomas Jones,* for appellant.

1st. The evidence contained in the first exception ought to have been excluded. It was merely preliminary and *ex parte* in its character, and should not have been admitted as a *bar* to the action, which was really the *ground* of objection. This species of evidence is everywhere excluded by the Courts, except where there are local statutes

authorizing the admissibility of it, as we shall show. Were it not so, the greatest injury might be inflicted on individuals, without any *timely* opportunity to defend themselves against *ex parte* charges.

Unfavorable impressions once produced on the public mind would frequently be difficult and often impossible to correct, and remove the damaging error by *reversing* public sentiment. Such a course of procedure does not promote the cause of public justice, but works, in many cases, irreparable wrong to innocent parties; and whether innocent or guilty, the publication, more frequently than otherwise, causes persons who are perhaps to sit in judgment of the matter to form *premature opinions on purely ex parte statements*.

Every man accused is entitled to a fair and impartial trial, but it is mockery of remedial justice to hold out the the assurance of fair trials, if the avenues of justice are polluted by irresponsible, reckless emanations through the public press, which are disseminated almost without limit, and are read by thousands eager to enjoy the latest sensation, and *involuntarily*, it may be, become themselves the *media* of further local circulation. The law, it is submitted, when properly administered, will arrest this lamentable state of things. 1 *Starkie on Slander, pages* 265–275, (*marginal;*) 1 *American Leading Cases*, 218, (*5th Edition, notes by Hare and Wallace;*) Stanley vs. Webb, 4 *Sandf. S. C.*, 24, (1850;) *Matthews vs. Beach*, 5 *Sanf S. C.*, 264, (1854;) *Cincinnati Gazette Co. vs. Timberlake*, 10 *Ohio State Reps.*, 548, (1860;) *Usher vs. Severance*, 20 *Me.*, 9.

In *Duncan vs. Thwaites*, 3 *B. & C.*, 582, it was held that where the justice has merely the power to commit or bail, the report of the proceedings had before him is *not privileged*. In such cases no one has the right to report the proceedings, and if he does, it is at his peril. *Good intentions* or *belief* in the truth of what he reports avails nothing. 1 *American Leading Cases*, 266 and 267.

The justice before whom the examination takes place has no rightful authority to report, and *per consequence* no one receiving the report from him and publishing it is justified. Even the report of counsel engaged in the cause will not protect any one. (4 *Sandf. S. C.*, 26.) Report "*in substance*" affords no protection. A plea that the publication "was nothing more than a fair, true and correct report in the newspaper" is not sufficient. *Ibid*, 28.

2nd. The record of the *plaintiff's acquittal* was clearly admissible as evidence in rebuttal of defendant's testimony tending to support the plea of justification. Had the plaintiff been *convicted* of the criminal charge against him the *record of conviction* would have been evidence to support the plea. 1 *American Leading Cases*, 190 ; *Townshend on Slander*, sec. 404 ; *Maybee vs. Avery*, 18 *Johns.*, 352.

Now if the *record of conviction* is evidence to support the plea of justification, it would seem strange if the *record of acquittal* is not evidence to *rebut* testimony tending to support the plea. The acquittal and discharge of a party by the committing magistrate is evidence of the want of probable cause in cases of malicious prosecution. *Strauss vs. Young*, 36 *Md.*, 255. And if held to bail or committed it would be evidence of probable cause. (1 *American Leading Cases*, 270.) The plaintiff could not have offered the record of acquittal in evidence *in chief,* as was contended in the trial below, because that would have been *anticipating* the defence. 2 *Greenl. Ev.*, sec. 429 ; 2 *Starkie*, 66 ; *Dugan vs. Anderson*, 36 *Md.*, 598.

3rd. The defendants having offered evidence tending to prove the *truth* of the defamatory matter declared on, it was competent for the plaintiff to repel the accusation by evidence of his good character. It must be borne in mind that the plaintiff sustained the *double relation* to the cause of *plaintiff and witness*, and had the right to oppose the *impeachment* by evidence for *truth and veracity, as well as*

*for good moral character. Davis vs. State,* 38 *Md.,* 49, 50 ; 1 *Greenleaf Ev., sec.* 54 ; 2 *Ibid, sec.* 426 ; 2 *Starkie, sec.* 102 ; *Harding vs. Brooks,* 5 *Pick.,* 244.

Wherein it is said "the mere placing the plea of justification on record is an impeachment of the plaintiff's character." *Ibid,* 247 ; 1 *American Leading Cases,* 248 ; *Townshend on Slander, sec.* 400; *Wright vs. Schroeder,* 2 *Curtis C. C.,* 548 ; *Dewitt vs. Greenfield,* 5 *Ohio,* (*Ham.*) 226.

In this case it is said "where the defendant has given *any evidence* in support of a justification in such cases, plaintiff may introduce proof of his general good character to rebut the presumption of guilt." *Paine vs. Tilden,* 20 *Vert.,* 564. *Negative* evidence is sometimes considered the best. 1 *Taylor's Ev., sec.* 325.

*Wm. M. Merrick,* for appellees.

There was no error in the ruling of the Court below.

1st. Because the Court below was right in admitting evidence tending to prove that the alleged libel, as published, was a substantially true summary of the facts as stated by Justice McCaffray, the committing magistrate, to a reporter of the "American" newspaper, under the general issue, as a matter in bar of the action and in mitigation of damages. 18 *Md.,* 188, 191 ; 2 *Greenl'f on Ev., sec.* 425.

2nd. Because the record of the Criminal Court of Baltimore City of the trial and acquittal of the plaintiff, on the charge of "indecent exposure of his person," was rightly excluded by the Court below as evidence in rebuttal.

The plaintiff may either, in the first instance, rebut the justification, or he may wait until the defendant has offered affirmative evidence in proof of justification ; but he cannot divide his proof by giving part in evidence in the first instance and part afterwards. 2 *Greenleaf on Evidence,*

*sec.* 429 ; 36 *Md.*, 588 ; *Folkard's Starkie on Slander and Libel, Wood's notes, star page* 548, and the authorities cited in note C ; 1 *Otto*, 244.

3rd. Because the Court below was right in excluding evidence of the plaintiff's good moral character, and restricting the plaintiff to showing what his character was for delicacy, modesty and chastity, as no evidence had been given as to the plaintiff's general character, but only as to the specific charges against him. 1 *Hilliard on Torts*, 404, ·*par.* 65–6 ; 8 *Gill*, 465 ; *American Leading Cases*, 247 *and* 248 ; 1 *Greenleaf Evidence, sec.* 54 ; *Folkard's Starkie on Slander and Libel, Wood's note, star page* 464, *middle page* 619 ; *Townshend on Slander, sec.* 387 ; 2 *Curtis C. C.*, 548 ; 1 *Comstock*, 530 ; 2 *Barb.*, 149 ; 9 *N. H.*, 146 ; 3 *Comstock*, 325.

4th. Because the Court below was right in making the addition to the plaintiff's first prayer, to wit: "unless they find for the defendants under their first and second prayers," because it only required the jury to find that the defendants published the paper writing of and concerning the plaintiff, &c., then the plaintiff was entitled to recover, unless they should find the said publication to be true, and utterly ignoring the rights of the appellees to comment on said charges, as contained in the first prayer of the defendants, and also ignoring the right of appellees to publish such matters of fact as a privileged communication, as contained in the second prayer of the defendants.    34 *Md.*, 134 *and* 137 ; 3 *Howard*, 287 ; *Folkard's Starkie on Slander and Libel, Wood's notes, top pages* 288, 289, *and star page* 194 ; 6 *Robinson's Practice*, 927, *and note* 2, 925 *and* 926.

5th. A. Because the Court below was right in rejecting plaintiff's second prayer, which allowed the jury, if they found that the defendants published the statement of January 8th, 1877, and March 28th, 1877, and should further find that the defendants interposed the plea of

justification, then these acts and doings, together with the other evidence in the case, was evidence of continued malice, which was competent for the jury to consider in their assessment of damages. 1 *Amer. Lead. Cases*, 190, *note ;* 6 *Robinson's Practice*, 954 *and* 955 ; *Townshend on Slander and Libel*, 485 ; *Snyder vs. Fulton*, 34 *Md.*, 138 ; *Folkard's Starkie on Slander and Libel, Wood's notes, star page* 459*, bottom page* 613.

B. The plea of justification is only evidence of malice when no evidence is offered in support of it, and defendant refuses to withdraw it, but never where the plea is substantially proved as in this case. *Folkard's Starkie on Slander and Libel, Wood's notes, sec.* 664, *middle page* 653.

6th. A. Because the Court below was right in rejecting the plaintiff's fourth prayer : " that in order to justify the publication as a report of legal proceedings, the defendants must show that the said report was full, fair, candid and true, not garbled nor discolored, or mixed up with commentary or insinuations, and that it was the report of the proceedings of a Court of competent jurisdiction, having authority to pronounce judgment on conviction, and not the report of the proceedings before a justice of the peace, in what the plaintiff terms a mere preliminary examination," thereby denying the right of the defendants to comment on said charges, and to publish the same as a privileged communication, simply because it was the report of proceedings before a justice of the peace. *Folkard's Starkie on Slander and Libel, top pages* 288 *to* 289 ; *Townshend on Slander and Libel*, 291 *and* 295 ; *Art.* 4*, sec.* 1*, Const.*, 1867.

B. The true criterion of the privilege is not whether the report was or was not *ex parte*, but whether it was a fair and honest report of what had taken place, published simply with a view to the information of the public, and *innocent of all intention to do injury to the reputation of the*

McBee *vs.* Fulton.

*party affected. · Folkard's Starkie on Slander and Libel,
star page* 194, and authorities in *note* 3.

7th. The Court below was right in rejecting the plaintiff's fifth prayer: "that in order to sustain the defendant's third plea, (the plea of justification,) the jury must believe from all the evidence in this case, that it is sufficient to warrant the conviction of the plaintiff, were he now on trial for the charges set forth in said publications, and that the evidence must show that the plaintiff is guilty of said charges so set forth in said publications, beyond all reasonable doubt; in other words, the evidence should, in the estimation of the jury, be sufficient to convict the said plaintiff on a criminal charge." It is sufficient if the plea is substantially proved, and the jury need not be satisfied beyond a reasonable doubt. *Townshend on Slander and Libel,* 489; *Folkard's Starkie on Slander and Libel, (Wood's notes,) notes middle page* 693.

MILLER, J., delivered the opinion of the Court.

The appellant sued the appellees, the editors and proprietors of a daily newspaper, called "The Baltimore American and Commercial Advertiser," published in Baltimore City, for the following alleged libel upon him, which appeared in that paper on the 25th of September, 1875, under the heading, "*a ruffian caged.*"

"For several weeks past the police of the North-western District have been endeavoring to make the arrest of a man named Wm. McBee, who has occasioned considerable trouble in various neighborhoods. It appears he is a low character who habitually frequents the streets and always seeks to throw himself in the way of school girls, often insulting them with indecent remarks and actions. In some instances he would wait around the schools until the dismissal of the pupils, and then would exhibit the greatest importunity in pressing his company upon them. This man and his reputation became so extensively known

in many of the female schools that he was feared by the scholars, and numerous precautions adopted to protect the girls from his insults. For several days past he had been visiting the locality of a well known and fashionable school, and created the greatest annoyance to the young ladies by his persistent familiarities and vulgar insults. The police were notified and yesterday succeeded in arresting him. He was given a hearing in the afternoon, when a number of young ladies who had been approached testified as to the facts as above narrated. Justice McCaffray committed him for the action of the grand jury.''

The defendants pleaded 1st, not guilty, and 2nd, that said alleged defamatory writing set out in the declaration is true, and the case was tried upon issues joined on these pleas. In the course of the trial, several exceptions were taken to the rulings of the Court, and these present for our determination one or two questions of interest and importance.

1st. The plaintiff offered in evidence the libellous publication declared on, and two substantial repetitions of the same, after suit brought, one published on the 8th of January, 1876, and the other on the 29th of March, 1877, in the same newspaper. He then further offered evidence tending to show that he was a laboring man, a mechanic, having a large family to support by his labor ; the wealth and position of the defendants ; the extent of the circulation of the newspaper in which the libellous publications appeared, and that the defendants were the editors, publishers and proprietors thereof, and there rested his case.

The defendants then, to sustain the issue on their part, offered evidence tending to prove that the plaintiff was arrested and taken before Justice McCaffray upon a charge of indecent exposure of his person, that an investigation and hearing was had upon that charge before the justice and witnesses examined thereat, but none were produced

or examined on the part of the plaintiff, and that at the termination of this examination the justice committed the plaintiff for the action of the grand jury. They further offered evidence tending to prove that the justice, at the termination of this examination, narrated the facts as they had been given in evidence before him, to the reporter of the newspaper, and that the narrative of facts elicited upon such examination as set out in the supposed libel, so far as the same appears to be a narrative thereof, is a substantially true summary of the facts as detailed to him by the committing magistrate, and that this narrative was prepared and published in the paper by the reporter as agent for the defendants, from the information thus furnished to him by the justice as and for a correct narrative thereof. They also further offered evidence tending to prove that they had no acquaintance with or any knowledge of the existence of the plaintiff prior to this publication.

The most important question in the case is, was the Court right in allowing this offered testimony to go to the jury, and in instructing them that if they find from the evidence that the several matters of fact narrated in the alleged libel were published by the defendants, and that the same are a *correct account* of the charges preferred against the plaintiff in the course of an official inquiry before a justice of the peace, and shall further find that the *commentaries* upon these matters of fact contained in this publication are a *fair commentary* upon the same, assuming them to be true, then the alleged libel was a *privileged communication,* and the plaintiff is not entitled to recover unless they shall further find the defendants were actuated by *express malice* towards the plaintiff.

Without going at large into the general question as to what communications the law protects from a civil action or criminal prosecution for libel, it is sufficient for the purposes of this case to say, that the adjudications both in

England and in this country, have now clearly settled that there are : 1st. Some communications which on grounds of *public policy* are *absolutely privileged.* What these are need not be specified. 2nd. Communications to which, on grounds of *public benefit* a *qualified privilege* is given, or those which are privileged by the occasion, if fair, *bona fide* and impartial, though defamatory of individuals and published to the world at large. Under this head are included newspaper and other reports of the proceedings of *Courts of justice :* and on the same grounds of public benefit and advantage, and within the same limits, the privilege extends to newspaper and other reports of debates and proceedings in Parliament or Legislative bodies in this country. *Folkard's Starkie on Slander and Libel,* (*Amer. Ed.,*) *sec.* 688.

The precise question presented by the rulings now under consideration is, whether the publication of a report of proceedings before a justice of the peace of this State, in in the course of a preliminary inquiry upon a charge of an indictable offence, resulting in holding the party to bail or committing him for the action of the grand jury, is entitled to the *qualified privilege* which attaches to the reports of the proceedings of Courts of justice? At one time the preponderance of judicial *opinion,* at least, in England may be conceded to have been against according this privilege to reports of such proceedings before the magistrates of that country. The case most strongly supporting that view is that of *Duncan vs. Thwaites,* 3 *Barn. & Cress.,* 556, decided in 1824. In that case the judgment of the Court was delivered by Chief J. ABBOTT, and all the then decisions and opinions of Judges having any bearing on the question, were referred to in argument on the one side or the other. The case cited which approached nearest to sustaining the privilege was *Currie vs. Walter,* 1 *Esp.,* 456, which his Lordship admitted was a case of great authority in itself and derived an additional

weight from the manner in which it was mentioned by Mr.
Justice LAWRENCE, in *Rex vs. Wright*, 8 *Term Rep.*, 293,
but he said it had not received the sanction of subsequent
Judges, and it differed in some important facts from the
case he was considering. Among the differences which he
pointed out was that in *Currie vs. Walter* there was an
account of a proceeding in the Court of King's Bench, a
Court instituted for final determination as well as prelimi-
nary inquiry, whose doors are, as they ought to be, *open*
to so many of the public as can be conveniently accommo-
dated within its walls, whereas the proceeding in the case
before him was before justices of the peace, and was of a
kind which they may lawfully conduct *in private* when-
ever they think fit to do so. Afterward in 1848, two Acts
of Parliament were passed, consolidating and amending
the several statutes relating to the duties of justices of the
peace. The first (11 & 12 *Vic.*, *ch.* 42,) prescribes their
duties with respect to persons charged with indictable
offences, and confers power to issue warrants of arrest, to
make preliminary examinations, to hold to bail or com-
mit for trial, similar in most particulars to the powers
possessed and exercised by justices of the peace in this
State. But by one of its sections it is declared that "the
room or building" in which the justices shall make such
preliminary investigations, "shall *not* be deemed an open
Court for that purpose," but whenever they consider it
proper, they may conduct the examination in private.
The second (11 & 12 *Vic.*, *ch.* 43,) relates to their duties
in cases of summary convictions and orders, and this
statute confers powers not possessed by our justices. It
also declares that "the room or place" in which they
shall sit to try such cases, "shall be deemed an open and
public Court, to which the public generally may have
access, so far as the same can conveniently contain them,"
and that the party accused shall be allowed to make his
full answer and defence, and have witnesses examined and

cross-examined by counsel: and it further appears that final judgments given under this statute are subject to appeal.    Afterwards, in 1858, the case of *Lewis vs. Levy*, (96 *Eng. C. L. Rep.*, 535,) was decided in the King's Bench, in which the privilege was sustained.    It was an action for three separate libels, published in a newspaper on three several days, each professing to give a report of what had taken place on different days before a magistrate, upon a charge of perjury preferred against the plaintiff. The magistrate acted under the first statute above cited, and after several adjournments and examining all the witnesses brought before him, dismissed the summons.    The judgment was delivered by Lord CAMPBELL, C. J., and it is important we should notice some of the views of the Court expressed in that opinion.    After stating the general proposition that it is a good defence to an action for libel, that it consists of a fair and impartial (though not *verbatim*) report of a trial in a Court of justice, they refer to the contention of the plaintiff's counsel, that this privilege must be confined to the proceedings of the superior Courts of law and equity, and entirely repudiate it, saying that "on such a question the dignity of the Court cannot be regarded : we must look only to the *nature* of the alleged judicial proceeding which is reported, and for this purpose no distinction can be made between a Court of *pie poudre* and the House of Lords sitting as a Court of justice."    They then refer to the contention that in *no case* have the reports of proceedings *before magistrates* any privilege, and to this general proposition refuse assent, and affirm that proceedings under Statute 11 & 12 *Vic.*, *ch*. 43, in cases of summary convictions and orders, are *strictly* of a judicial nature, for the reason among others, that the place in which such proceedings are held is an open Court.    Coming then to the proceedings before them (which as we have seen were under Statute 11 & 12 *Vic.*, *ch*. 42,) and to the case of *Duncan vs. Thwaites*, which

was relied on as having determined the *general doctrine* that a report of such proceedings cannot be justified, they say that in that case the libel contained the highly colored statement of the reporter, evidently insinuating the guilt of the accused, and that much stress was laid by Lord TENTERDEN in delivering the judgment of the Court, upon the fact that the proceedings terminated in the first instance by holding the accused to bail for trial, whereas in this case, the examination terminated in the dismissal of the summons.   The opinion then proceeds: "We are not prepared to lay down for law that the publication of preliminary inquiries before magistrates is universally lawful, but we are not prepared to lay down for law, that the publication of such inquiries is universally unlawful; although there are numerous *dicta* there is no *decision* to that effect." His Lordship then cites with marked approval the case of *Currie vs. Walter,* where the alleged libel consisted of a report in the *Times* of an application in the Court of King's Bench for a rule to show cause why a criminal information should not be filed against magistrates for a conspiracy corruptly to refuse a license to a public house. The rule was refused on technical grounds and the report truly set out the contents of the affidavits making the charge.   The case was tried before C. J. EYRE, who told the jury that though the matter contained in the paper might be very injurious to the character of the magistrates, yet that being a true account of what took place in a Court of justice, which is open to all the world, the publication of it was not unlawful, and on a rule *nisi* for a new trial, all the Judges of the Common Pleas were clearly of opinion the action could not be maintained.   The opinion then affirms that that case "has been often criticized but *never overturned,* and often *acted upon;*" that it received the unqualified approbation in *Rex vs. Wright,* of that great Judge, Mr. Justice LAWRENCE, who observed that, though the publication of such proceedings may be to the

disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of Courts of justice should be universally known, and that the general advantage to the country in having these proceedings made public more than counterbalances the inconveniences to private persons, whose conduct may be the subject of such proceedings ; and that the decision of Chief Justice EYRE rests "on sound legal principles, and is now almost universally approved of." Then after showing that the only difference to be relied on between that case and the one before them was in the tribunals, we have this positive and emphatic expression of opinion on that subject: "But although a magistrate upon any preliminary inquiry respecting an indictable offence may, if he thinks fit, carry on the inquiry in private, and the publication of any such proceedings before him would undoubtedly be unlawful, we conceive that while he continues to sit *foribus apertis*, admitting into the room where he sits as many of the public as can be conveniently accommodated, and thinking that this course is best calculated for the investigation of truth and the satisfactory administration of justice, (as in most cases it certainly will be,) we think the Court in which he sits *is to be considered a public Court of justice.*" And finally, while declining to give an opinion in favor of the general legality of publishing reports of such proceedings, where the accused has been committed or held to bail for an indictable offence, the Court yet say "but we cannot join in the sweeping condemnation of *police reports,* pronounced *obiter* before the benefit arising from those reports had been fully experienced ; we believe that they often lead to the detection and punishment of crime, and that they sometimes assist in the vindication of character," and against the severe denunciation of such reports by several eminent Judges, they place the opinion of Lord DENMAN, C. J., delivered before a committee of the House of Lords, in 1843 on the

law of libel, in which his Lordship said "I have no doubt that police reports are extremely useful for the detection of guilt by making facts notorious, and for bringing those facts more correctly to the knowledge of all parties interested in unravelling the truth. The public, I think, are perfectly aware that those proceedings are *ex parte*, and they become more and more aware of it in proportion to their growing intelligence ; they know that such proceedings are only in course of trial and they do not form their opinion until the trial is had. Perfect publicity of judicial proceedings is of the highest importance in other points of view, but in its effects upon character I think it desirable."

From the views thus expressed by Lord CAMPBELL, it is plain the reports of such proceedings were then regarded by English Judges much more favorably than they were in 1824 when *Duncan vs. Thwaites* was decided. But in 1868, ten years after *Lewis vs. Levy*, the case of *Wason vs. Walter*, (4 *Law Rep. Q. B.*, 73,) was decided in the same Court. The admirable judgment delivered by C. J. COCKBURN, in that case has received the approval of this Court in *Snyder vs. Fulton*, 34 *Md.*, 128, as well for the soundness of the legal propositions therein stated, as for the clear and forcible manner in which they are expressed. There the alleged libels consisted of a report in the *Times* of a debate in the House of Lords, in which the plaintiff was charged with falsehood and malignity, and of an editorial article in the same paper containing comments unfavorable to the plaintiff founded on this debate. For the first time the question was directly presented for adjudication, whether reports of debates in parliament were entitled to the qualified privilege to which we have adverted, and the Court held that the analogy between such reports, and those of proceedings of Courts of justice, is in every respect complete, and that the privilege with its limitations which attaches to the one necessarily

McBee *vs.* Fulton.

attaches to the other. And this exception to the general law of libel in both cases is rested upon the broad principle that the advantage to the community from publicity being given to such proceedings, is so great that the occasional inconvenience to individuals arising from it must yield to the general good. "If," say the Court, "the principles which are the foundation of the privilege in the one case are applicable to the other, we must not hesitate to apply them. Whatever disadvantages attach to a system of unwritten law, and of these we are fully sensible, it has at least this advantage, that its elasticity enables those who administer it to adopt it to the varying conditions of society, and to the requirements and habits of the age in which we live, so as to avoid the inconsistencies and injustice which arise when the law is no longer in harmony with the wants and usages and interests of the generation to which it is immediately applied. Our law of libel has in many respects only gradually developed itself into anything like a satisfactory and settled form. The recognition of the right to publish the proceedings of Courts of justice has been of modern growth. Till a comparatively recent time the sanction of the Judges was thought necessary even for the publication of the decisions of the Courts upon points of law. Even in quite recent days Judges in holding publication of the proceedings of Courts of justice lawful, have thought it necessary to distinguish what are called *ex parte* proceedings as a *probable* exception from the operation of the rule. Yet *ex parte* proceedings *before magistrates*, and even before this Court, as for instance our applications for criminal information, *are published every day*, but such a thing as an action or indictment founded on a report of such an *ex parte* proceeding is unheard of, and if any such action or indictment should be brought it would *probably be held* that the true criterion of the privilege is not whether the report was or was not *ex parte*, but whether it was a fair and honest report of

what had taken place, published simply with a view to the information of the public and innocent of all intention to do injury to the reputation of the party affected." Then as to the article containing the comments, the Court affirmed the ruling at the trial, in which the jury were told "that they must be satisfied that the article was an honest and fair comment on the facts, in other words that they must be satisfied that the comments had been made with an honest belief in their justice, but that this was not enough, inasmuch as such belief might originate in the blindness of party zeal or in personal or political aversion ; that a person taking upon himself publicly to criticise and to condemn the conduct or motives of another, must bring to the task not only an honest sense of justice, but also a reasonable degree of judgment and moderation, so that the result may be *what a jury shall deem*, under the circumstances of the case, a *fair and legitimate* criticism on the conduct and motives of the party who is the object of censure." We refer also to the very recent case of *Usill vs. Hales*, 26 *Weekly Reporter*, 371.

Such are the opinions now held by the English Courts on this subject. The only American cases cited by the appellant's counsel or which we have been able to discover in which this question was directly presented, are *Stanly vs. Webb*, 4 *Sandf.*, 21, and *Gazette Co. vs. Timberlake*, 10 *Ohio State Rep.*, 548. In each of these it was decided that the privilege did not extend to the publication of such proceedings before magistrates, but for this position each of them relies upon the case of *Duncan vs. Thwaites*, and prior expressions of opinion by English Judges. The case in *Sanford* was decided in 1850, and in 1854 the Legislature of New York passed an Act (which seems to be merely declaratory of the common law,) to the effect that no action will lie for the publication of a fair and true report of a judicial proceeding, except on proof of malice in the making it, which is not to be implied from

the fact of the publication, and it was held in 1874 by the Superior Court in that State, that a fair and true report of an *ex parte* affidavit presented to a police magistrate, to obtain a search-warrant, was privileged as a judicial proceeding, and no action could be founded thereon, even by a party who though named in the affidavit was not the party arrested under the warrant. *Ackerman vs. Jones,* 37 *N. Y. Sup. Ct. Rep.,* 42.

In this State we are neither restrained nor aided by any adjudication of this Court upon the subject. The views of the English Judges in the recent cases referred to appear to us to be well founded and we see no good reason why we should not adopt them. By our Constitution justices of the peace are made part of the judiciary in whom the judicial power of the State is vested. The most useful and important part of their duties is to investigate charges for indictable offences, and when so acting they are unquestionably judicial officers discharging judicial functions. Here no authority (as in England) has been conferred upon them by statute to conduct their examinations *in private*. When a party accused of crime is brought before a justice of the peace the investigation which follows is public, or in presence of as many of the public as may choose to attend or can be accommodated in the room or place where the proceeding is conducted. The accused may then disclose his defence or remain silent and reserve it for the time of trial. If he adopts the former course, he has the right, if he chooses, to have counsel to examine and cross-examine the witnesses against him, and upon his reasonable request the magistrate has power to summon and compel the attendance of any witnesses who can give material evidence in his behalf. The investigation may be continued from time to time, and if upon examination of the whole matter and all the witnesses it appears the charge against the accused is wholly groundless, the magistrate may discharge him without

even requiring bail, but if there appears to be probable ground to suppose him guilty, then the magistrate holds him to bail, if the offence be by him bailable, or if not so bailable or in default of bail commits the party to jail to await the action of the grand jury. When thus publicly acting in the discharge of judicial duties we see no reason why these proceedings thus publicly conducted before magistrates, whether the accused permits them to be *ex parte* or makes his defence, or whether they result in his discharge or committal, should not be deemed the proceedings of a public Court of justice, and reports of them entitled to this qualified privilege under the law of libel. Such reports are now and have long been daily made in almost all the public journals of the country, and we are of opinion they are thus privileged for the reasons and upon the grounds stated by Lord CAMPBELL and Chief Justice COCKBURN in the cases we have cited. This privilege, which may be set up under the plea of not guilty, is, as we have seen, not absolute but qualified. The qualifications or limitations attached to it have already been indicated. The reports, though they need not be *verbatim*, must be substantially correct and not garbled or partial, and made *bona fide* or without malice, and whether they are of this character is in all cases where this defence is set up and under consideration a question of fact for the jury. And the same thing is true of the comments accompanying such reports; they must be correct and fair and it is for the jury to say whether they are so or not. When we have these essential limitations to be enforced by juries, we see no reasonable ground to apprehend that the privilege while it may subserve the public interest, will leave private character to the mercy of the libeller. In the present case these limitations were correctly applied and left to the finding of the jury by the instruction we have been considering. That part of this instruction which mentions "express malice" needs but few words to

show its correctness. All the authorities concur in the proposition that the publication of defamatory matter raises the presumption of *legal malice* and ordinarily no other proof of malice is required than proof of the publication itself, but where the occasion of the publication is lawful and a privilege therefore exists, this presumption is repelled and the jury must find actual or express malice, as distinguished from implied or legal malice. The Court was also clearly right in telling the jury as they did in another instruction, that the subsequent publications of the alleged libel were to be considered by them only as tending to prove that the original publication declared on as the foundation of the action proceeded from express malice or ill-will to the plaintiff. Such subsequent publications, if admissible at all, were admissible for this purpose only. *Folkard's Starkie on Libel and Slander*, secs. 586, 587.

2nd. The next question arises upon the plea of justification and the instructions granted thereon. In civil suits (whatever may have been the case in criminal prosecutions) for libel, it has always been held that the truth of the defamatory matter may be pleaded in justification, and if established by proof is a complete bar to the action. The defendants' first prayer, which the Court granted, is addressed to this view of the case. By it the jury were instructed that if they found that the several charges contained in the publication declared on *were true*, then the commentaries accompanying those charges were but a fair and reasonable condemnation of the acts so charged, and the defendants were justified as well in the narrative of the charges as in the comments thereon, and the plaintiff cannot recover. In this instruction it is assumed that the fairness and reasonableness of the comments is a question of law for the Court and not of fact for the jury, and the only objection that can be made to it must rest on this ground. But it is to be observed that this question arises

in a very different aspect of the case from that where a
similar question is presented by the defence of privilege
under the plea of not guilty.   By this plea of justification
the defendant assumes the serious burden of proving the
truth of the defamatory matter.   Now, if an alleged libel
charges a party with murder, and under such a plea it is
proved that he actually committed that crime, it is clearly
no libel to call him a murderer.   In such case the fairness
and reasonableness of the comments, may well be treated
as a question of law for the Court.   Although we have
found no case in which this point has been expressly
adjudged, we have yet no hesitation in so deciding.   And
upon the assumption that the plaintiff was actually proved
guilty of the acts which the alleged libel in this case
charges against him, we find nothing by way of comment
either in the term "ruffian," in the heading of the article,
or in any other part of it, which is not a fair and rea-
sonable condemnation of such acts and the party who
committed them.   By another instruction the Court told
the jury that in determining the plea of justification they
would consider all the evidence in the case, and weigh
the same, and if they found the *preponderance* thereof in
favor of the truth of the alleged libel this is sufficient to
establish the plea, and that it is not necessary they should
be convinced of that truth *beyond a reasonable doubt*, and
rejected a prayer of the plaintiff to the effect that the
evidence must show that the plaintiff is guilty of the
charges "beyond all reasonable doubt: in other words,
that the evidence must be sufficient to convict the plaintiff
on a criminal charge" of the imputed offence.   On this
point there is much conflict of authority, and the cases on
both sides are collected in the note to *Folkard's Starkie
on Libel and Slander, page* 693.   In the absence of any
authority in this State to the contrary, we think the true
rule on this subject is stated in the recent and well con-
sidered case of *Ellis vs. Buzzell*, 60 *Maine*, 209, where all

the decisions and the principles on which they are rested
are considered and reviewed.   We agree with the Court in
that case that if the slanderous words or alleged libel
impute to the plaintiff the commission of a crime, and the
plea of justification is interposed "the defendant must
fasten upon the plaintiff all the elements of the crime both
in act and intent, and to do this he must furnish evidence
enough to overcome in the minds of the jury, the natural
presumption of innocence as well as the opposing testi-
mony : but to go further and say that this shall be done
by such a degree and quantity of proof as shall suffice to
remove from their minds every reasonable doubt that might
be suggested, is to import into the trial of civil causes
between party and party, a rule which is appropriate only
in the trial of an issue between the State and a person
charged with crime, and exposed to penal consequences if
the verdict is against him." There the instruction which
was held to gratify this rule was that if the defendant
had made out the truth of the charge by a preponderance
of testimony, it was sufficient to entitle him to a verdict.
Our examination of the authorities has also convinced us
of the truth of the observations made by the Court in that
case, that "with a very few unimportant exceptions, the
cases in which it has been held that to sustain a plea of
justification the defendant must adduce such proof as
would suffice for the conviction of the plaintiff upon an
indictment have been cases in which the words used
imputed *perjury,* and in most of them the matter more
directly under consideration has been the propriety of
regarding the plaintiff's testimony upon the occasion
referred to as evidence in the cause to be overcome by the
production of more than one witness to prove its falsity—
the necessity of showing that his testimony was false in
intent as well as in fact—its materiality or some point
affecting the truth of the charge, and not the necessity of
proving the commission of the crime beyond a reasonable

doubt." And with them we agree that "we have no occasion to question these decisions so far as they enforce the necessity of proving all the elements necessary to constitute the crime, by an amount of evidence sufficient to overbalance the plaintiff's side of the case."

3rd. As to the rulings in the second and third exceptions.

In the second exception, after the defendants had offered proof tending to sustain the plea of justification, the plaintiff by way of rebuttal, offered in evidence the record of his acquittal by the Criminal Court of Baltimore City, of the charge of indecent exposure of his person on the occasion referred to, and this the Court rejected. In this ruling there was no error. Such acquittal could not be replied to the plea of justification by way of *estoppel*, (*Folkard's Starkie on Libel and Slander, sec* 505,) nor does the acquittal of the plaintiff on an indictment charging him with the same offence as is specified in the plea of justification, preclude the defendants from proving the truth of the charge, *nor indeed does it seem to be evidence at all;* for where the words imputed a charge of murder for which the plaintiff had been tried and acquitted, it was held the defendant might justify specially, and that the truth of such plea might be tried. *Ibid, sec.* 693, *England vs. Bourke*, 3 *Esp.*, 80. Reference is also made on this point to the recent case of *Layman vs. Latimer*, 26 *Weekly Rep.*, 305. Reliance was placed in argument upon the fact that in an action for false arrest and malicious prosecution the record of the plaintiff's acquittal is admissible, but in such an action it must be shown by the plaintiff as an essential requisite to the maintenance of his suit that the criminal prosecution against him had terminated in his favor, and hence in that species of action the record of acquittal is admissible to prove that part of the plaintiff's case. But no such thing is required in an action for libel, and his acquittal in a prosecution by *the*

*State* for the offence charged in the libel, is neither evidence for him in chief nor in rebuttal under the plea of justification, for under that plea the question of his guilt must be tried *de novo*.

After the defendants had offered evidence under this plea by several witnesses, tending to show that the plaintiff had made an indecent exposure of his person to them at a certain time and place, and on two other occasions, the plaintiff offered the testimony of several witnesses tending to show that at the time mentioned he was absent some two or three miles from the locality, and then offered the testimony of a number of witnesses that he was a man of good moral character. The Court restricted this offer of character to showing what his character was for delicacy, modesty and chastity, and to this restriction he excepted. This constitutes the third exception, and as we understand it, it presents the question whether the plaintiff can offer evidence of general good character in rebuttal of the defendant's proof under the plea of justification tending to show that he was guilty of the imputed offence. It is not a question whether the defendant can under the general issue, and in mitigation of damages, show particular bad traits of character in the plaintiff. If evidence of bad character is admissible at all for the defendant under that issue, it is for the purpose of showing that a bad character is less damaged by a libel or slander than a good one, and in such case there is good reason for requiring the defendant, if he attempts to assail the plaintiff's character at all, to show that it is generally bad. But where the proof is confined to the plea of justification, under which the defendant assumes the burden of proving the plaintiff guilty of the imputed offence, and the latter seeks to repel the defendant's proof on that subject and show his innocence by evidence of good character, his evidence on that point and for that purpose must, in our judgment, be confined to those traits of character which the

imputed offence involves. The question presented is the same as if·he were on trial for the offence and sought to adduce evidence of`character in his defence. In such case the character to be proved must not be general, but such as would make it unlikely that the accused would be guilty of the particular crime with which he is charged. 1 *Whart. Cr. Law,* (7th *Ed.,) sec.* 636. Upon the general subject of evidence of character in actions like the present there is much apparent conflict of opinion and authority. We do not propose to review the decisions nor attempt to reconcile them. As the question is presented on this record and in this·case, we are satisfied the Court below committed no error in this ruling. The record does not show that the plaintiff himself was examined as a witness, and hence the question whether his good character for truth and veracity could be given in evidence under the decision in *Davis vs. The State,* 38 *Md.,* 50, does not arise.

From what we have said it follows that the rulings upon the admissibility of evidence in the first, second, and third exceptions, the granting of the defendants' first and` second prayers, the Court's modification of the plaintiff's first prayer, the rejection of his second, fourth and fifth prayers, and the Court's instruction in lieu of the defendants' ninth prayer were correct. The Court's instruction in lieu of the plaintiff's second prayer being, as we have shown, right in other respects, if there was any error in that part of it which declares that the interposition of the plea of justification might be taken by the jury as evidence tending to prove express malice in the original publication, it was an error in favor of the plaintiff and not against him. The jury having found a verdict for the defendants, it is plain they must have so found either upon the plea of justification or the defence of privilege, and it therefore becomes unnecessary for us to consider whether or not the Court gave them correct instructions upon the question of damages. For the same reason it is

also unnecessary to determine whether the Court's instruction in lieu of the defendants' third prayer was right. This disposes of all the rulings in the case and finding no ground of reversal, we must affirm the judgment.

*Judgment affirmed.*

(Decided January 25th, 1878.)

