Dennis E. SEYMOUR

v.

The A.S. ABELL CO., et al.

Civ. No. Y–82–670.

United States District Court,
D. Maryland.

Jan. 25, 1983.

Harry Goldman, Jr., Baltimore, Md., and. Peter Max Zimmerman, Towson, Md., for plaintiff.

Douglas D. Connah, Jr., Baltimore, Md., for defendant A.S. Abell Pub. Co.

Stephen H. Sachs, Atty. Gen. for State of Maryland, and James L. Shea, Asst. Atty. Gen., Baltimore, Md., for defendant James J. Doyle, Esq.

Francis B. Burch, Jr., Charles P. Scheeler, Baltimore, Md., Bruce W. Sanford, Lee Levine, and Brian S. Harvey, Washington, D.C., for defendant United Press Intern., Inc.

Peter F. Axelrad, and Thomas M. Wood, IV, Baltimore, Md., for defendant Capital Gazette Newspapers.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

Plaintiff Dennis Seymour, a retired fifteen year veteran of the Maryland State Police, brought this defamation suit in the Baltimore City Court. Defendant United Press International, Inc. ("UPI") removed the suit to this Court on the grounds of diversity jurisdiction pursuant to 28 U.S.C. § 1441(c).

Plaintiff filed a motion to remand this suit to the Baltimore City Court. Defendants filed motions for summary judgment. These motions have been fully briefed and are now ready for resolution.

## BACKGROUND

This suit arises out of a 1979–80 Maryland state police undercover investigation into the illegal sale of stolen antiques and historical artifacts. As part of this investigation, the State Police established a "front" store in Baltimore, called "Operation Bear Trap II," for the purpose of buying stolen antiques and artifacts, resulting in the recovery of over $1 million worth of stolen property.

Complaints surfaced at the conclusion of Bear Trap II that several of the police officers involved in the operation converted property received at the "front" store to their own use. These complaints triggered an internal investigation which resulted in the issuance of six administrative charges against Seymour. Three of the charges alleged that Seymour violated the Maryland state police rule against the conversion or

misappropriation of property for his own use. The fourth charge alleged that Seymour used his official position for personal or financial gain. The last two charges alleged that Seymour engaged in secondary employment without approval.

The internal police investigation and the subsequent administrative charges against Seymour were reported in several Maryland newspapers. On February 5, 1980, *The Evening Sun,* published by defendant A.S. Abell Co. ("Abell"), printed an article on page A1 with the headline "Charges on police urged." The article continued on page A3 under the heading " 'Sting' officers may be facing theft charges." On February 6, 1980, *The Sun,* also published by Abell, printed an article entitled "State Police to be charged on 'sting' theft." On February 6, 1980, the *Evening Capital,* published by defendant Capital Gazette Newspapers, Inc. ("Capital"), printed an article with the headline " 'Sting' thefts." On February 7, 1980, the *Daily Mail* published an article, prepared by UPI, entitled "Policeman charged in 'sting' theft."

Seymour alleges that these four newspaper stories maliciously libeled him and that defendant James Doyle, a Maryland Assistant Attorney General, was the source for all four stories. The gravamen of Seymour's complaint is that defendants defamed him by using the word "theft" in reporting the internal police investigation and the administrative charges. Seymour points out that he was not charged with "theft" or any other criminal activity, but rather was charged with the violation of state police rules prohibiting the "conversion" or "misappropriation" of police property for personal use. Seymour seeks $1 million in compensatory damages and $5 million in punitive damages from the defendants.

## THIS SUIT WAS PROPERLY REMOVED TO THIS COURT

Before addressing the merits of plaintiff's claims, it is necessary to determine whether the suit was properly removed to this Court. UPI, a Delaware corporation which does not have its principal place of business in Maryland, removed this suit pursuant to 28 U.S.C. § 1441(c). That section provides:

> Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise nonremovable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction.

Seymour argues that his claim against UPI, the only defendant that is diverse to him, is not a separate and independent claim or cause of action from his claims against the other defendants and contends that all the defendants are effectively locked through Doyle, the alleged source for the four stories, thereby rendering the claims against all the defendants inseparable from one another. UPI, on the other hand, argues that each separate publication of a libel constitutes a separate and independent claim or cause of action.

In *American Fire and Casualty Co. v. Finn,* 341 U.S. 6, 14, 71 S.Ct. 534, 540, 95 L.Ed. 702 (1951), the leading case on § 1441(c) removal, the Supreme Court held that "where there is a single wrong to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c)." In *Finn,* where the Court held that removal was improper, the plaintiff alleged alternative claims against two insurance companies and their local agent for recovery of a single fire loss. The plaintiff in *Finn* sought damages for the single wrong of a failure to pay for his property lost by fire.

In the instant case, however, Seymour does not allege alternative grounds for relief against the four defendants, but instead alleges that he was wronged by each separate publication as well as Doyle's dissemination of the information about the internal police investigation and the administrative charges. Significantly, Seymour does not allege that there was a conspiracy among the defendants nor does he allege that the defendants are jointly liable. It is

954

a well-established principle of tort law that each publication of a libel constitutes a separate and independent tort. *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 60–61 (2d Cir.1980); *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 630–31 (10th Cir.1977). Accordingly, where, as here, absent an allegation of conspiracy or joint action, each claim that a defendant libeled a plaintiff is a separate and independent claim or cause of action within the meaning of § 1441(c). *Scott v. Stauffer Communication*, 8 Med.L. Rep. 1329 (D.Kan.1982); *Dougherty v. Capital Cities Communications*, 7 Med.L.Rep. 2535 (E.D.Mich.1981); *Gay v. Williams*, 486 F.Supp. 12 (D.Alaska 1979); *Schultz v. Newsweek*, 7 Med.L.Rep. 2537 (E.D.Mich. 1976). *See also Scheideler v. Jones*, 105 F.Supp. 726 (S.D.N.Y.1952); *Spriggs v. Associated Press*, 55 F.Supp. 385 (D.Wyo.1944). *Lewis v. Time, Inc.*, 83 F.R.D. 455 (E.D.Cal. 1979), relied on by Seymour, is not to the contrary since that case involved only a single publication.

█ Seymour requests that, even if his claim against UPI is held to be properly removable, the Court should remand the claims against the other non-diverse defendants. While § 1441(c) gives this Court the discretion to remand the claims against the non-diverse defendants, the interests of judicial economy are better served by this Court retaining the entire case. *Leinberger v. Webster*, 66 F.R.D. 28, 33 (E.D.N.Y.1975); *Baltimore Gas and Electric Co. v. United States Fidelity & Guaranty Co.*, 159 F.Supp. 738, 741 (D.Md.1958). Since the claims against all the defendants arise out of the same series of events, it would be unduly wasteful of scarce judicial resources to remand the claims against the non-diverse defendants.

## SUMMARY JUDGMENT WILL BE GRANTED FOR ALL DEFENDANTS

The Court now turns to defendants' motions for summary judgment. Although the Court is well aware that summary judgment should not be granted unless there are no genuine issues of material fact and a movant is entitled to judgment as a matter of law, the Court must not shy away from granting summary judgment where this standard has been met. In *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), Judge Wright, in a frequently cited passage, noted the importance of summary judgments in defamation suits:

> Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement.

In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the *Times* principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government.... Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered."

(citations omitted). *See also Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 864 (5th Cir.1970); *Time, Inc. v. Johnston*, 448 F.2d 378, 383 (4th Cir.1971); *Fitzgerald v. Penthouse International, Ltd.*, 525 F.Supp. 585, 596 (D.Md.1981), *rev'd on other grounds*, 691 F.2d 666 (4th Cir.1982); *Woods v. Hearst Corp.*, 2 Med.L.Rep. 1548, 1549 (D.Md.1977); *Meeropol v. Nizer*, 381 F.Supp. 29, 32 (S.D.N.Y.1974), *aff'd*, 560 F.2d 1061 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978).

The Court, after careful review of all memoranda and affidavits, concludes that summary judgment should be entered in favor of all defendants for two separate reasons. First, defendants' allegedly defamatory statements are privileged under the Maryland common law qualified privilege to publish matters involving violations of the law. Second, defendants are entitled to summary judgment because at the time the alleged defamatory statements were made Seymour was a "public official" and therefore the allegedly defamatory statements are privileged under the First Amendment. While both the Maryland privilege and the First Amendment privilege are forfeited if defendants acted with actual malice, the Court holds that no reasonable jury could find that the defendants acted with actual malice.

## DEFENDANTS' ALLEGEDLY DEFAMATORY STATEMENTS ARE PRIVILEGED UNDER THE MARYLAND COMMON LAW QUALIFIED PRIVILEGE TO PUBLISH MATTERS INVOLVING VIOLATION OF THE LAW

■ "It is well settled that in Maryland a newspaper enjoys a qualified privilege to publish reports of arrests and charges on which arrests are made, as well as other matters involving violation of the law." *Koren v. Capital-Gazette Newspapers,* 22 Md.App. 576, 581, 325 A.2d 140, *appeal denied,* 273 Md. 721 (1974); *accord Brush-Moore Newspapers, Inc. v. Pollitt,* 220 Md. 132, 138, 151 A.2d 530 (1959); *Evening News Co. v. Bowie,* 154 Md. 604, 611, 141 A. 416 (1928); *McBee v. Fulton,* 47 Md. 403, 417 (1878); *Zaminski v. Jennings,* 6 Med.L. Rep. 1788, 1789 (Md.Ct.Spec.App.1980); *Schaefer v. Hearst Corp.,* 5 Med.L.Rep. 1734 (Balto.Super.Ct.1979); *Piracci v. Hearst Corp.,* 263 F.Supp. 511, 514 (D.Md.1966), *aff'd,* 371 F.2d 1016 (4th Cir.1967); *Pulvermann v. A.S. Abell Co.,* 131 F.Supp. 617, 623 (D.Md.1955), *aff'd,* 228 F.2d 797 (4th Cir. 1956). The Maryland privilege "is lost only when it can be shown that defendant abused the privilege by publishing the defamatory statement ... with 'actual malice.'" *Koren,* 22 Md.App. at 581, 325 A.2d 140; *accord Zaminski,* 6 Med.L.Rep. at 1789; *see Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978) ("actual malice" to defeat Maryland privilege is the same as "actual malice" to defeat First Amendment privilege).

■ While the Maryland privilege is usually expressed in terms of insulating newspapers from liability for defamatory statements, *see Brush-Moore Newspapers,* 220 Md. at 138, 151 A.2d 530; *Koren,* 22 Md. App. at 581, 325 A.2d 140; *Zaminski,* 6 Med.L.Rep. at 1789, the policy underlying the privilege makes it clear that the privilege protects not just newspapers but any person who makes an oral, written or printed report about matters involving violation of the law. The policy behind the privilege is that the public's strong interest in receiving information about matters involving violation of the law outweighs the interest of the subjects of defamatory statements at least where the defamatory statements are not made with actual malice. *See Cowley v. Pulsifer,* 137 Mass. 392, 394 (1884) (Holmes, J.). Since the public's interest in receiving the information is just as strong whether the purveyor of the information is a newspaper or some other source, the Court holds that the Maryland privilege applies to all persons who pass on information about matters involving violation of the law. *Accord McBee,* 47 Md. at 417 ("privilege extends to newspaper and other reports"); *see also American District Telegraph Co. v. Brink's Inc.,* 380 F.2d 131, 133 (7th Cir.1967); *Glantz v. Cook United, Inc.,* 499 F.Supp. 710, 715 (E.D.N.Y.1979); *Restatement (Second) of Torts,* § 611, comment c; Eldredge, *The Law of Defamation* 421–22 (1978). Thus, provided that all the elements of the privilege are met, the privilege protects the allegedly defamatory statements of defendant Doyle as well as the newspaper defendants.

■ To bring the Maryland privilege into play, the allegedly defamatory statements must be: 1) about matters involving violation of the law; 2) substantially accurate; and 3) fair. *Piracci,* 263 F.Supp. at 513. In the instant case, it is clear that all three elements have been met.

■ The allegedly defamatory statements by defendants concerned an internal police investigation and administrative charges about alleged misappropriation or conversion of police property. Although no formal criminal charges were ever filed, the police investigation and administrative charges unquestionably constitute "matters involving violation of the law." Indeed, most, if not all, police activity concerns matters involving the violation of the law. Simply put, police business is legal business, most especially so when the police investigate and file administrative charges against alleged wrongdoing of their own. Narrowly interpreting the phrase "matters involving violation of the law" to connote only formal criminal charges would be inconsistent with the policy underlying the Maryland privilege and unduly restrict the flow of valuable information to the public.

■ In determining whether allegedly false statements are substantially accurate, a court must consider the statements in their entirety. *Heath v. Hughes,* 233 Md. 458, 464, 197 A.2d 104 (1964). So read, this Court finds that the four newspaper stories sued upon in the instant case are substantially accurate. Although all four articles use the term "theft" in the headlines, all of the articles expressly state that: 1) the investigation was an internal police investigation and not a criminal investigation and 2) that the charges were administrative and not criminal. Viewed from the perspective of "readers of common and reasonable understanding," *Goldsborough v. Orem & Johnson,* 103 Md. 671, 682, 64 A. 36 (1906), the articles clearly convey the message that the investigation and charges were administrative and not criminal in nature. Moreover, the use of the word "theft" as shorthand for administrative charges of misappropriation or conversion does not render an article inaccurate. *See Handelsman v. San Francisco Chronicle,* 11 Cal.App.3d 381, 90 Cal.Rptr. 188, 191 (Cal.App.1970). In this vein it is worth noting that a long line of cases holds that technical errors in legal nomenclature in reports of matters involving violation of the law are of no legal consequence. *See, e.g., Simonson v. United Press, International, Inc.,* 654 F.2d 478, 482 (7th Cir.1981) (defendant substituted the word "rape" for the technically correct term "sexual assault"); *Orr v. Argus-Press Co.,* 586 F.2d 1108, 1112 (6th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) ("swindle" substituted for "defraud"); *Lambert v. Providence Journal Co.,* 508 F.2d 656, 659 (1st Cir.1975); *cert. denied,* 423 U.S. 828, 96 S.Ct. 45, 46 L.Ed.2d 45 (1975); *Dostert v. Washington Post,* 8 Med.L.Rep. 1170 (N.D.W.V.1982) ("guilty" substituted for "nolo contendere"); *Piracci,* 263 F.Supp. at 515 ("possession of marijuana" substituted for "delinquency due to the act of possessing marijuana"); *Fendler v. Phoenix Newspapers, Inc.,* 7 Med.L.Rep. 2569 (Ariz.Ct.App.1981); *Schaefer,* 5 Med.L.Rep. at 1735 ("indictment" substituted for crime charged "by way of a summons"); *see also Anderson v. Stanco Sports Library, Inc.,* 542 F.2d 638, 641 (4th Cir.1976) (substitution of phrase "high ranking member of the Mafia for "membership in the Mafia" without legal significance).

Apart from the requirement that the allegedly defamatory statements be substantially accurate, the statements must also be fair in order to fall within the Maryland privilege. The requirement of fairness is summed up succinctly by the *Restatement:*

> Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article.

*Restatement (Second) of Torts,* § 611, comment f. Judged by these standards, the four articles are eminently fair. None of the articles expressly or impliedly states

that Seymour or any other policeman was guilty of wrongdoing. *See Piracci*, 263 F.Supp. at 514. Rather, the articles are straight-forward accounts of the investigation and administrative charges without any improper editorializing or innuendo. Significantly, each of the articles makes clear that the investigation and charges involved "alleged" wrongdoing; nowhere is it mentioned that Seymour or any other policeman had been found guilty of wrongdoing nor do any of the articles simply assert as a fact that Seymour or any other policeman committed wrongful acts. *Cf. Marcone v. Penthouse International, Ltd.*, 533 F.Supp. 353, 358 (E.D.Pa.1982).

Having found that the four articles concerned matters involving violation of the law and were substantially accurate and fair, the Court concludes that the articles are protected by the Maryland privilege. The question of whether the defendants acted with actual malice and thus forfeited the Maryland privilege will be considered after the discussion on the First Amendment privilege.

DEFENDANTS' ALLEGEDLY DEFAMATORY STATEMENTS ARE PRIVILEGED UNDER THE FIRST AMENDMENT PRIVILEGE TO PUBLISH MATTERS RELATING TO A PUBLIC OFFICIAL'S OFFICIAL CONDUCT

In the landmark case of *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), the Supreme Court stated:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice."

Thus, where a plaintiff in a defamation suit is a public official and the allegedly defamatory statements relate to his official conduct, the plaintiff may not recover damages consistent with the First Amendment unless the defendants acted with actual malice. This is precisely the situation in the instant case.

Seymour, a state police sergeant at the time the allegedly defamatory statements were made, was a public official within the meaning of the *New York Times* case. As noted by the Supreme Judicial Court of Maine: "every court that has faced the issue has decided that an officer of law enforcement, from ordinary patrolman to Chief of Police, is a 'public official' within the meaning of federal constitutional law." *Roche v. Egan*, 433 A.2d 757, 762 (Me.1981); *see, e.g., Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir.1981); *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir.1977) (federal drug enforcement agent); *cf. Berkey v. Delia*, 287 Md. 302, 320–23, 413 A.2d 170 (1980). The Tenth Circuit explained why even a low ranking police officer is a public official:

> The cop on the beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official.

*Gray*, 656 F.2d at 591. Since the allegedly defamatory statements concerned Seymour's role in Operation Bear Trap II, they clearly related to Seymour's official conduct.

DEFENDANTS DID NOT ACT WITH ACTUAL MALICE

The Court now turns to the question whether defendants forfeited the Maryland and First Amendment privileges by acting with actual malice. In *New York Times*, 376 U.S. at 280, 84 S.Ct. at 726, the Supreme Court defined "actual malice" as knowledge that a defamatory statement "was false or with reckless disregard of whether it was false or not." Subsequently, in *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 'S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Court stated that:

[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

Based on the affidavits submitted by the parties and the Court's view that the use of the word "theft" as a substitute for "misappropriation" or "conversion" is of no legal significance, the Court concludes that no reasonable jury could find that defendants acted with actual malice in reporting the police investigation and charges. There is simply no evidence whatsoever that defendants knew their statements were false or entertained serious doubts as to the truth of their statements.

The Court's conclusion is compelled by *Ryan v. Brooks*, 634 F.2d 726 (4th Cir.1980). In *Ryan*, as in the instant case, defendant did not give a verbatim account of the story that he received from his sources. In *Ryan*, the defendant used the word "extorted" to describe the manner in which a corporation obtained political contributions from its executives. The Fourth Circuit held that, absent evidence of knowing falsehood or reckless disregard of the truth, the fact that the defendant changed the words of his source does not create a jury issue on the question of actual malice. 634 F.2d at 733. Similarly, in the instant case where there is no evidence whatsoever that defendants knew or doubted the veracity of their statements, the fact that they used the word "theft" to describe "misappropriation" or "conversion" does not create a jury issue. In the words of the Fourth Circuit, this Court cannot "find proof of malice in [defendants'] use of slightly stronger language than his source's." *Id.; see also, Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (omission of the word "alleged" in a story on police brutality did not raise a jury issue on actual malice); *Orr*, 586 F.2d at 1116;

*Samborsky v. Hearst Corp.*, 2 Med.L.Rep. 1678 (D.Md.1977).

Accordingly, for the reasons stated herein, it is this 25th day of January, 1983, by the United States District Court for the District of Maryland, ORDERED:

1. That plaintiff's motion to remand BE, and the same IS, hereby DENIED; and

2. That the summary judgment motions of defendants UPI, Abell, Capital and James Doyle BE, and the same ARE, hereby GRANTED.*

---

* The Court notes that subsequent to the briefing of the motions decided herein, Seymour served defendant Associated Press. Associated Press has as yet to file a responsive pleading and, accordingly, is not affected by this Memorandum and Order.